UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,


      -against-                        NOTICE OF MOTION
                                                    Indictment Number
                                                    03-CR-315 (S-2)(ERK)

Roderick Soto and Luis Angel Ramos,
aka Jay Rock,
                     Defendants.
- - - - - - - - - - - - - - - - - X

      PLEASE TAKE NOTICE, that, upon the annexed affirmation of Robert L. Moore,

attorney for the defendant, LUIS ANGEL RAMOS, the appended Memorandum of law, the

affidavit of the defendant, Luis Angel Ramos, the attached exhibits, and upon the prior

proceedings had in this matter, and the Government being provided with the opportunity to

respond to this motion, the undersigned will move this Court, at the United States Courthouse at

225 Cadman Plaza East, Brooklyn, New York 11201, on April 22, 2005, or as soon thereafter as

counsel can be heard, with the Government being Noticed and Heard, for (1) an Order pursuant

to Rule 29 (c) of the Federal Rules of Criminal Procedure, to vacate the judgment and dismiss

the indictment against the defendant, on the grounds that (a) the evidence was insufficient to

sustain the convictions, and (b) that the prosecution of the indictment violated the statute of

limitations, and (2) in the alternative, for an Order, pursuant to Rule 33 (a), (b)(2) of the Federal

Rules of Criminal Procedure, Title 18 United States Code section 3501 et. seq., and Rule

12(b)(3) Federal Rules of Criminal Procedure, that a new trial should be ordered on the grounds

that (a) evidence introduced at trial evidence of property seized from the defendant's home

pursuant to a search warrant, to wit: assorted weapons, and any testimony relating thereto,

should not have been presented to the jury, (b) that the evidence resulting from a subpoena duces

tecum employed by the Government was improperly admitted into evidence, since the subpoena

was over-broad in its scope, and (c) that the Court erred in allowing the Government to introduce

evidence of other crimes, and  (3) for such other relief as to the Court seems warranted by this

application pursuant to those sections.

Dated: April 14, 2005
          Nassau County, New York


                                              _____
                                              Robert L. Moore (RLM0182)
                                              128 Avon Place
                                              West Hempstead, New York 11552
                                              (516) 486-7307
                                              Attorney for Defendant
                                              Luis Angel Ramos

To:      Clerk of the Court (By electronic submission)
         United States District Court
         Eastern District of New York
         U.S. Courthouse
         225 Cadman Plaza East
         Brooklyn, NY 11201

         Hon. Edward R. Korman
         Chief United States District Judge
         Eastern District of New York
         Chambers
         225 Cadman Plaza East
         Brooklyn, New York 11201

         Colleen Kavanaugh, Esq.
         Brian Rose, Esq.
         Assistant United States Attorneys
         Eastern District of New York
         One Pierrepont Plaza
         Brooklyn, New York 11201
         (718) 254-7000


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA,

    -against-                                        <u>Affirmation</u>

Roderick Soto and Luis Angel Ramos,
aka Jay Rock,
                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

      ROBERT L. MOORE, an attorney admitted to practice before the courts of the State of New York and a member of the bar of this Court hereby affirms under penalty of perjury and states that the following is true unless based upon information and belief, in which case it is believed to be true:

1. By appointment of the Court, I represent the defendant, Luis Angel Ramos (hereafter, the "defendant" or "Ramos"), in the above-captioned action, and, being familiar with the procedural history of the case, and having represented the defendant at the trial of the indictment, respectfully submit this affirmation in support of the within motion for a judgment of acquittal pursuant to Rule 29 (c), or, in the alternative, for a new trial, pursuant to Rule 33 (a), (b)(2) of the Federal Rules of Criminal Procedure (hereafter, "FRCrP"), as specified in the Notice of Motion.

2. The documents appended hereto include the subject search warrant (Exhibit 1), and the New York City Police Department vouchers numbered F994306, F994328, and F994327 (Exhibit 2), the Government's letter dated January 31, 2005 (Exhibit 3), and the Government's subpoena to Sing Sing Correctional Facility (Exhibit 4).

3. On June 18, 1995, police officer Joseph Courtesis, shield # 20824, of the New York City Police Department, 83rd Precinct, made application for a warrant in the Supreme Court of the State of New York, County of Kings, to search the premises 22 Dodworth Street, First floor.

4. The application for the search warrant was granted and signed by the Hon. Michael A. Gary

on June 18, 1995.

5. The warrant was executed on June 20, 1995, and weapons, identified in Exhibit Two, were seized from the premises 22 Dodworth Street, First floor apartment. As appears from the defendant's affidavit, he resided at that location.

6. The trial of the instant indictment commenced with jury selection on May 3, 2004, and was completed on June 10, 2004.  The defendant was convicted on all counts in the indictment.

7. On May 6, 2004, following completion of the jury selection process, the Government notified counsel/affiant that it intended to place evidence of that seizure before the jury.  Shortly thereafter, counsel requested, and received, a copy of the warrant and supporting affidavit.

8. The warrant contains a handwritten note, apparently by the issuing judge, that the informant provided sworn testimony before him on June 18, 2004.

9. The Government advised counsel on May 6, 2004, that it did not possess a record of that sworn statement.

10.  Immediately prior to resting its case, the government sought to introduce the subject weapons into evidence.  This Court, over objection by the defendant, indicated that the circumstances regarding the subject seizure of weapons could be placed in evidence, and that the question of its admissibility resolved should there be a guilty verdict.

11.  Following the verdict, convicting the defendant on all counts in the indictment, the Government agreed to attempt to procure the transcribed minutes of the search warrant application. The Court waived the seven day statutory time limitations for post-verdict motions, and gave leave to present post-verdict motions, and a motion to suppress or controvert the search warrant prior to sentence.

12.  On January 31, 2005, the government advised counsel/affiant that a search of the records of

the reporters for the Kings County Supreme Court was negative, and that the subject minutes had been lost, and are therefore unavailable (Exhibit Three-Government's Letter).

13. For the reasons outlined in the attached Memorandum of Law, the contraband seized from the defendant's apartment-the weapons identified herein-and testimony relating to that property should not have been admitted in evidence at the trial of the indictment, and the prejudicial effect of that evidence deprived the defendant of a fair trial, and a new trial should be ordered.

14.  As appears in the attached Memorandum of Law, the evidence taken from the defendant pursuant to a court-ordered subpoena (Exhibit Four), should not have been admitted into evidence, and the prejudicial effect of that evidence deprived the defendant of a fair trial, and a new trial should be ordered.

15. Further, evidence of other crimes, introduced by the Government over objection, was unnecessarily prejudicial, and a new trial should be granted on this ground, as appears in the attached Memorandum of Law.

16. As appears in the attached Memorandum of Law, there was insufficient evidence to prove that the defendant participated in the racketeering conspiracy charged in count one, and that judgment should be reversed and the indictment dismissed.

17. Further, as appears in the attached Memorandum of Law, and the record of the trial, the defendant, assuming arguendo his participation in the charged conspiracies, the defendant effectively abandoned that participation prior to the five year period of limitations effective on May 18, 1998.

WHEREFORE, for the reasons advanced herein and in the attached papers, it is respectfully requested that the instant motion be granted and the indictment dismissed, or a new trial ordered.

Dated: April 14, 2005
    Nassau County, New York


                                    _____
                                    Robert L. Moore (RLM0182)
                                    Attorney for the Defendant
                                    Luis Angel Ramos


UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
UNITED STATES OF AMERICA,

-against-                                              <u>Affidavit</u>


Roderick Soto and Luis Angel Ramos,
aka Jay Rock,
                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        State of New York
                                )ss
        County of Kings

        Luis Angel Ramos, being duly sworn, under penalty of perjury, hereby makes the
following statement in support of the attached Motions:

1. I am the second named defendant in the above-captioned action.

2. On June 20, 1995, I resided with my wife, Naomi Quinones, and our children, at the premises

22 Dodworth Street, Brooklyn, New York, in the first floor apartment (to the right as the

building is entered).


                                        _____
                                                    Luis Angel Ramos

Sworn to before me this
_____ day of _____, 2005



_____
Notary Public




UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
UNITED STATES OF AMERICA,

-against-

Roderick Soto and Luis Angel Ramos,
aka Jay Rock,

                          Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW

## **FACTS**

The facts relied upon are contained in the accompanying affidavit of Robert L. Moore, attorney for the defendant, Luis Angel Ramos, the transcribed minutes of the trial, the affidavit of the defendant, and the appended exhibits.

## **ARGUMENT**

**Point 1. The defendant's constitutional rights under the Fourth Amendment were violated, and, as a result, evidence of the firearms recovered from the defendant's home was admitted in error.**

<u>Facts</u>

On June 20, 1995, acting pursuant to a search warrant[1] secured two days earlier, state police officers entered an apartment in 22 Dodworth Street, Brooklyn, New York (defendant's residence)[2] and recovered the below listed firearms:

> 1 Black Uzi pistol
>
> 2 Black .38 caliber revolvers
>
> 1 shotgun (12 gauge)

and assorted ammunition (T.3005).[3]  Evidence of this seizure was placed before the jury at the close of the Government's case-in-chief (T.2975, 3006-3008).

The warrant affidavit, sworn to by New York City police officer Joseph Courtesis, alleged that (a) an informant[4] registered with the Kings County District Attorney was inside the subject premises on June 3, 1995 between 6:00 p.m. and 10:00 p.m. and saw "approximately six handguns" on a kitchen table, (b) an individual known to the informant as "Jay" resided in the subject premises, (c) on June 9, 1995, between 12 Noon and 3:00 p.m. the same informant saw "Jay" exit those premises with a handgun, and (d) On June 14, 1995 the same informant was inside the premises between the hours of 5:00 p.m. and 9:00 p.m. and observed "Jay" exit a bedroom with a handgun (Exhibit 1).  The warrant was signed by Hon. Michael A. Gary, a judge of the Supreme Court of the State of New York, after "sworn testimony" of the

---

[1]See Exhibit 1-Search Warrant and Affidavit

[2]There are two apartments on the first floor of the subject building.  The officers entered the one to the right (defendant's residence).

[3]Numerals following "T" reference the pagination of the trial record

[4]The informant was identified as "CI # 293/95" (Exhibit 1).

informant.[5]/[6]

The warrant affidavit identifies the premises to be searched as "22 Dodworth Street, 1st Floor", and that it "can be found by entering the location, walking down the hallway to the end and entering the brown door on the right" (Exhibit 1).  The affidavit further informed the issuing magistrate that "[t]here are only two apartment doors on that floor" and that the "number 22 appears above the entrance to the location" (Exhibit 1).  The affidavit specifies that the informant "described the ... location to [the] deponent", who thereafter drove by the location and confirmed that the "building was indeed on Dodworth Street ... and that the numbers 22 were clearly marked above the entrance door" (Exhibit 1).

For the reasons that follow, the evidence was admitted in error, and its prejudicial effect deprived the defendant of a fair trial.[7]

## Applicable Law

Where, as here, evidence seized pursuant to a search warrant authorized by a state judicial officer is proffered in a federal court, federal law controls.  United States v. Pforzheimer, 826 F.2d 200, 204 (2nd Cir. 1987).

---

[5]That notation was drafted in hand onto the face of the warrant (Exhibit 1).

[6]The Government agreed to attempt to obtain the minutes of the search warrant proceeding (See T.2979, 2983-2984). For all that appears, the proceedings before Judge Gary, if transcribed by a stenographic reporter, are unavailable.  The Government's search for them has resulted in its communication to the defendant on January 31, 2005 that they have been "lost" (See Exhibit 3-Government's Letter).

[7]The defendant has requested the identity of the informant identified in the warrant affidavit.  The Government has refused to divulge that information unless ordered by the Court, and has not provided a reason for the refusal. Accompanying this motion is a draft order compelling the Government to disclose the identity of the informant, with appropriate biographical information.  This is necessary, for the reasons advanced herein, and also to enable the defendant to adequately investigate and prepare for the hearing that is also requested herein.

The Franks issue[8]

As a general rule, due process of law does not require the government to expose the identity of a confidential informant upon a defendant's demand when there is ample evidence in the probable cause hearing to demonstrate that the informant was reliable and his information credible.  McRay v. Illinois, 386 U.S. 528 (1967).  Ordinarily, the officer who received the "tip" from the informant will be subject to cross-examination, and the reliability of the information tested.  United States v. Pena, 961 F.2d 333, 340 (2nd Cir. 1992).  Additionally, in the usual case, a "deliberate falsity or reckless disregard whose impeachment is permitted ... is only that of the [warrant's] affiant, not that of any non-governmental informant."  Franks v. Delaware, 438 U.S. 154, 171 (1978).  However, the government cannot insulate the deliberate misstatement of its agent by relaying it through another agent, even though the affiant is personally ignorant of the falsity. Franks 438 U.S. at 161, n6; citing Rugendorf v. United States, 376 U.S. 528, 533 n.4 (1964).  Thus, where a government agent is shown to be the source of the information, a "substantial preliminary showing" by the defendant of a false statement that is necessary to the finding of probable cause, mandates a hearing on the credibility of the information.  Franks, 438 U.S. at 155.  The government may not "shield itself from Franks suppression hearings by deliberately insulating affiants from information material to the determination of probable cause."  United States v. Wapnick 60 F.3d 948, 955 (2nd Cir. 1995)(where informant is a government official, a Franks suppression hearing may be had).

The Finding of Probable Cause

Where, as appears to be the case here, a registered informant provides the source of information claimed to provide probable cause, there is concern about its veracity since he/she

_____

[8]Franks v. Delaware, 438 U.S. 154 (1978)

may have "concocted [his/her] story while pretending to cooperate in order to harass an innocent or curry favor with" the police.  United States v. Wagner,989 F.2d 69, 73 (2nd Cir. 1993). Review of such reliance by law enforcement entails a "balanced assessment of the relative weights of all the various indicia of reliability (and unreliability) attending the informant's tip, but should nevertheless pay heed to the "highly relevant" circumstance of an informant's veracity and basis of knowledge.  Illinois v. Gates, 462 U.S. 213, 230,234 (1983).  Where the informant's past reliability is provided in general terms and where the officer's observations are non-specific, probable cause will not be established.  United States v. Pena, 961 F.2d 333,338 (2nd Cir. 1992)        Generally, reliance is placed on an informant's past performance.  See United States v. Gonzales,835 F.2d 449, 450 (2nd Cir. 1987)(two of informant's tips resulted in convictions). Probable cause may be established, however, even where the informant's past performance is untested or unknown, if "the informant's declaration is corroborated in material respects".  Wagner, at 73.  See Massachusetts v. Upton, 466 U.S. 727 (1984)(untested informant's description of stolen property matched police reports of property taken in recent burglaries); see Whitely v. Warden, Wyoming State Penitentiary, 401 U.S. 560 (1971)(additional information of the officer must be corroborative of the informant's tip that a crime was committed).

        Generally, a magistrate's "finding of probable cause is entitled to substantial deference. [However, a] reviewing court must decide whether the magistrate performed his neutral and detached function on the facts before him, and did not merely serve as a rubber stamp for conclusions drawn by the police."  United States v. Travisano, 724 U.S. 341, 344-345 (2nd Cir. 1983); see United States v. Pena, 961 F.2d at 338 ("it does not suffice to provide a mere conclusory statement that gives [the fact finder] virtually no basis at all for making a judgment

regarding probable cause").

Probable cause to search, unlike probable cause to arrest, is dependent on a time factor, since the items sought to be seized may not remain in place.  The doctrine of "staleness" is codified in Rule 41 (c)(1), FRCrP.  Ten days is the outside limit within which to execute a search warrant upon its approval by the issuing magistrate . See United States v. Marin-Buitrago, 734 F.2d 889, 894 (2nd Cir. 1984). The "critical factors" in a staleness issue are "the time elapsed between the criminal activity and the application for a warrant, and ... the type of crime involved".  See United States v. Ortiz, 143 F.3d 728, 732 (2nd Cir. 1998).

### Discussion

The warrant affidavit makes clear that the information leading to the seizure was derived solely from a "confidential informant registered with the Kings County District Attorney's Office", identified by number 293/95 (Exhibit 1-Warrant).   Thus, a factual issue presented is whether that informant was an agent of the police.  If the informant is a government agent, his/her credibility is at key issue.  The viability of the warrant rests solely on the truthfulness of the information imparted by the informant to the subscribing police officer, and the warrant cannot be insulated from review where, as alleged here, there is a governmental nexus between the deponent and the informant.  See Franks v. Delaware, 438 U.S. at 155, 161. Accordingly, a hearing is required for the Court to make the preliminary determination regarding the status of the informant.  See United States v. Wapnick 60 F.3d at 955.

A determination by this Court that the informant is a government agent, and that, as a consequence, the face of the warrant affidavit is not immune from scrutiny, is necessary to insure the defendant's right to a further hearing, upon a proper showing, to test the credibility of the informant.  Franks v. Delaware, 155, 161.  If this determination is made, the Franks rule is

implicated, and the defendant given the opportunity to make the "preliminary showing" that

mandates an evidentiary hearing.  As noted, the Government, despite requests for disclosure, has

refused to provide the identity of the registered confidential informant (absent an order of the

Court). The defendant and his wife (Naomi Quinones) are in a unique position to give evidence

regarding the alleged presence of an individual (here, the informant) in their apartment at the

times stated, and therefore to the accuracy of the information imparted to police officers.  Upon a

preliminary determination that the confidential informant was a state agent, and that Franks

therefore mandates a hearing on the credibility of the informant's testimony.  Accordingly, upon

the demonstration that the informant may be deemed a government agent, his/her identity must

be disclosed.   The failure of the Government to disclose the identity of the informant, or the

Court's refusal to so order such disclosure, in the circumstances described herein, would

deprived the defendant of a valued due process right supplied by Franks and its progeny, and

mandate suppression of the fruits of the seizure.

Further, the warrant fails on its face, since it does not adequately specify the place to be

searched. U.S. Constitution, Amendment IV; See United States v. Canfield, 212 F.3d 713, 718

(2nd Cir. 2000);  United States v. Travisano, 724 F.2d at 344. The affidavit states that the subject

contraband can be found in a first floor apartment in the premises 22 Dodworth Street.

However, the affidavit also notes that there are two first floor apartments.  The language that one

of those on the first floor is to the "right" down the hallway does not save the warrant, since that

information is not specifically ascribed to the informant, and may have come from the officer's

observations at the time of entry.  The affidavit simply, and without more, informed the issuing

magistrate how the apartment "to the right" can be found if one is in the hallway of the subject

building.  The affiant officer merely states that the informant showed him the "location", which

can only be inferred to be the building (22 Dodworth), which he (the officer) then confirmed was in fact in place.

Next, it is respectfully submitted that the information contained in the warrant application is "stale". The application was presented to the magistrate on June 18, 1995. The first piece of information, made on June 3, 1995, details the alleged observation of six weapons on a kitchen table. It is a puzzle why the police did not act on that information. Since the only independent observation done by the police was to confirm that the building (22 Dodworth) did exist, there is no reason why that information should not have prompted immediate action. Weapons are fungible and easily disposed of, and the reason in the instant case for the "no-knock" and "immediate" entry provisions granted by the issuing state judge. At the time of the warrant application, there was insufficient indicia of continuing criminal conduct. Cf. United States v. Gallo, 863 F.2d 185, 192 (2nd Cir. 1988)(continuing conduct renders passage of time less significant). The first item references a time 15 days prior to the warrant application, and by itself, and given the disposability of weapons, is clearly "stale" information. The second and third items of information merely indicate,respectively, that the person described as "Jay" left the building, and a bedroom with a weapon with no indication that they were returned. Indeed, the second item does not particularize the "place" any further than the building (22 Dodworth), and the removal of two weapons does not give rise to the probability that they were returned.

Additionally, the lack of a transcribed record of the proceedings should not inure to the Government's benefit. Facially, the warrant is deficient, because it does not indicate the past reliability of the informant and the corroborating detail of the deponent is limited to a bare description of the premises. See Illinois v. Gates, 462 U.S. 213 239 (1983); Whitely v. Warden, 401 U.S., supra; see United States v. Pena, 961 F.2d at 338 (past reliability in general terms

insufficient). Cf. Massachusetts v. Upton, 466 U.S. 727 (1984)(probable cause established when untested informant's description of stolen property matched police reports of property taken in recent burglaries); United States v. Gonzales, 835 F.2d 449, 450 (2nd Cir. 1987(informant's prior tips led to convictions).  The officer's corroboration was, for all that appears, limited to and directed only to the existence of the building, and is insufficient to sustain the warrant on its face.  Pena, id.

The notation of the issuing magistrate, limited to a statement that the informant was sworn is not enough to save the warrant, precisely because it is not known what was sworn to, and that detail cannot surface by guess or surmise.  The requirement that the issuing magistrate conduct a searching inquiry has not been demonstrated and cannot be assumed.  The "[r]eviewing court must decide whether the [issuing] magistrate performed his neutral and detached function on the facts before him, and did not merely serve as a rubber stamp for conclusions drawn by the police."  United States v. Travisano, 724 F.2d at 345.

Finally, and perhaps most troubling, is the process by which this evidence found its way to the jury.[9]  The government surely knew of the fact of the seizure prior to the indictment, and, indeed, supplied the vouchers stemming from it during the discovery phase of this case.  Yet there was no pre-trial announcement of an intention to introduce the fruits of the June 20, 1995 search.  That notice came after the conclusion of jury selection, and, for all that appears, the decision to place this evidence before the jury was not finalized until the government was prepared to rest its case.  Traditionally, such matters are the subject of pre-trial motions and hearings (if proper).  This is to put defendants on notice of the evidence to be used against them,

_____

[9]The Court indicated at trial that it would not preclude the evidence on an "estoppel" theory (T.2981).  The argument here is offered to more fully press that claim.

and to provide, prior to jury selection, for an opportunity to challenge the legality of the procurement of the evidence.  If the evidence is to be allowed, it affects the jury selection process, virtually mandating the posing of certain questions to the venire, as well as the choosing of citizens to sit on the jury.  It is an understandable reaction, where evidence is only discovered during a trial, and if it is otherwise admissible, to forestall the motion until after the trial (if necessary).  However, where, as here, the government has known of evidence long before the commencement of trial, and opt not to disclose the intention to utilize it until well past the twelfth hour, the reasoning for holding post-trial hearings simply disappears.  The government should have been barred from introducing this evidence due to its inexcusable neglect in proffering it.

This trial error is of constitutional dimension, as it implicates the defendant's rights under the Fourth Amendment, and, for the reasons that follow, is not harmless beyond a reasonable doubt.   The prejudice is clear.  As soon as the government completed its recitation of Ramos's possession of weapons, which was the first link to the enterprise made by the government in its summation (T.3147), the weapons and contraband caches of necessarily conceded members were juxtaposed.   Weapons recovered from the home of Julio Monseratte included  9 mm, .25 caliber automatic, .44 magnum handguns and a 12 gauge shotgun.  Contraband seized from the homes of Danny Hernandez and Jonathan Wagner was then detailed (T.3148-3152).  Wagner was a charter member, and Hernandez easily the most notorious, whose macabre crimes were prominently displayed as part of the government's proof of the activities of the enterprise.

The case against the defendant is built around the testimony of cooperating witnesses whose credibility was severely challenged.  Jose Pastrana ("Cholo") testified, regarding the Valencia homicide, that the defendant, and others at the scene, placed a "real, real, real, hot

spoon" on the genitalia of the victim in order to induce him to reveal information about narcotics (T.1070).  The medical examiner's evidence put the lie to that assertion with absolute certainty (T.2960-2961).  Pastrana failed to inform the government, during any of the numerous pre-trial proffer sessions, about two murders, one allegedly committed by the defendant and another individual, allegations that did not surface until his cross-examination (T.2695, 2703).  Further, the effort to corroborate Pastrana's account that Ramos engaged in a chase with the police and attempted to dispose of the deceased's body (Valencia) was compromised by the police account which detailed a description of the person being pursued that did not match Ramos.  The officer described the fleeing individual as being 5'10" tall (Pastrana's height), while Ramos is 5'5" tall (T. 2888, Stipulation, at 3112-13).   Finally, Pastrana's recitation of his sordid criminal history, of course, makes his testimony suspect as a matter of law[10]/[11].

Telly Concepcion demonstrably and repeatedly lied to the government during his proffer sessions, and, indeed, on those occasions, admittedly implicated an innocent person (T.2620-2622).  The testimony of Jose Diaz ("Joe Monte"), suspect *ab initio*, is critically undermined by the factual impossibility of his account of seeing the defendant at the door of the Romero/Silva robbery could not have occurred as he described it.  Diaz stated that he went back to the scene of the robbery because he was told by his wife, the sister of robbery victim, that she had received a telephone communication from "Fat Angelo" from the robbery scene, and event that the totality of the testimony shows did not happen.  Indeed, Angel Silva ("Fat Angelo") testified that "Carmen" called, and that there was only one phone in his apartment (T.2002, 2152-2154).

---

[10]The Court is, no doubt, sufficiently familiar with this statistic, and needs no further recitation here.

[11]This instruction applies, of course, to each of the government's cooperators.

Thus, the evidence coming from these suspect sources is inherently and testimonially suspect. The evidence of the weapons seizure, put to use by the government in its summation, was clearly prejudicial, and cannot be said to have had no impact on the jury.  The testimony of witnesses whose credibility is as suspect as those offered by the government in the case at bar was raised far beyond its rightful place in the jury's evaluation by the unconstitutional foundation of the weapons seizure.[12]

This portion of the defendant's post-verdict motion is made pursuant to Rule 33 (a)(b)(2) and, based on the foregoing, respectfully requests that a new trial be granted, or, in the alternative, a hearing be conducted on the issues presented.

**Point 2. The Government's subpoena to the defendant's state prison facility was overbroad, and the evidence derived therefrom should, therefore, have been suppressed.**

The facts surrounding the issuance of the subject subpoena are largely unknown to the defendant, owing to its *ex parte* nature, and because, upon information and belief, the defendant was in federal custody, and his property had not accompanied him.  The material seized as a result of it was in the possession of the government prior to trial and made a part of the pre-trial discovery process.  The court-ordered subpoena demanded, in pertinent part, that all papers and property of the defendant be provided to the Government for the purposes of their investigation. There was no specificity, and no items were particularly identified.

This subpoena does not satisfy federal standards.  The materials or items sought must be

---

[12]The prosecution detailed its theories regarding the so-called "Woodbine Crew" for thirty pages (T.3117-3146) without a single mention of the defendant.  Its first foray into the attempt to link him with the "Crew" was a description of the weapons seizure, couple with the graphic, and unsupported, assertion that those guns were for the use of the enterprise (T.3141). This evidence was then juxtaposed with seizures of weapons from individuals not on trial and demonstrably tied to the "Woodbine Crew", Julio Monseratte, Danny Hernandez, and Jonathan Wagner (T.3148).

particularly identified and must be relevant and admissible.  See United States v. Nixon, 418
U.S. 683 (19740; Bowman Dairy Co. v. United States, 341 U.S. 214 (1951).  Further, a rule
17(c) subpoena may not be used as a discovery device.  See United States v. Marchisio, 344 F.2d
653 (2nd Cir. 1965); 24 F.R.D. 138, 141 (SDNY 1959)(Rule 17[c] cannot be used "to obtain leads
as to the existence of additional documentary evidence or to seek information relating to
defendant's case").

It seems clear that the government's subpoena runs afoul of the standards, and should not
have been issued in the first instance.  Upon objection to the admissibility of the evidence
gleaned from the subpoena[13], on the grounds (without case citations) noted here, this Court did
not rule on the merits of the application, and permitted the evidence to be placed before the jury
on the grounds that the defendant's application was "untimely" (T.2908-2911).  It is respectfully
submitted that this ruling was an abuse of discretion, and should be corrected now.

It was impossible for the defendant to move to quash the subpoena, owing to its *ex parte*
nature.   There seems to be no principled reason why a motion to suppress the fruits of the
subpoena be limited to a pre-trial setting.  Virtually all similar evidentiary matters were
considered during the trial.  The admissibility of Rule 404(b) evidence was determined during
trial, because the Court understandably wanted to weigh it against the evidence proffered at trial.
Indeed, the legality of the government's offer of the weapons seizure has been deferred to the
trial's end.  This evidence was vigorously utilized by the government to attempt to show the
defendant's association with other "Crew" members.  While the error (the issuance of the
subpoena and the evidence therefrom) is not constitutional is scope, and the standard of review

---

[13]Photographs of defendant with other individuals identified as members of the
"Woodbine Crew" (Government's Exhibits LR2-LR9).

more favorable to the government, its introduction was clearly prejudicial to the defendant, and,
coupled with the evidence of the weapons seizure, improperly aided the government's cause in
putting the defendant in the "Woodbine Crew".  This is significant because the other evidence of
this necessary evidence is scant to non-existent.  Indeed, the government concedes that, at best,
the defendant was a limited partner.  There is no direct testimony that identifies the defendant as
a member.  Jose Pastrana ("Cholo"), his close friend, did not give testimony to that effect.  That
the defendant was seen at a public place (neighborhood auto "races") with Hernandez and
Wagner is insufficient evidence of knowing participation in a racketeering enterprise.  It is
through the innuendo generated by the photos taken from the defendant by means of a subpoena
improperly issued that the government buttressed its case of membership.  The admission of this
evidence was error, and the failure of the Court to address it at trial, to no prejudice to the
government, should be corrected at this juncture.  Pursuant to Rule 33(a)(b)(2), a new trial
should be ordered.

**Point 3. The evidence of other crimes of the defendant introduced by the Government
pursuant to Rule 404(b) was improper.**

**Background**

In its motion to admit certain evidence, the Government alleged that Ramos was "an
associate of the enterprise and participated in numerous violent robberies, kidnappings and
murders" (G.4)[14].  Specifically, Ramos was accused of the kidnapping and murder of Luis
Munoz on or about September 4, 1994; the murder of Hernando Enciso Valencia on or about
August 8, 1994; and the robbery of John Romero and Angel Silva on or about February 5, 1995.
Ramos is also charged with conspiracy to commit robbery for the period 1990 through 1999, and

_____

[14]The Government's memorandum in support of its motion is denoted "G", with page
numbers following.

with the use of firearms in connection to the predicate acts alleged in the indictment.

 A. The Government noticed the crimes listed below, alleged to have been committed by Ramos and not charged as predicate racketeering acts, and argued for their admissibility on the grounds that this evidence is relevant, that is, it makes the "existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence", and that it is "highly probative" and "not ... unfairly prejudicial" (G.10).

  1. The 1995 assault and attempted murder of John Romero by Ramos and others

  2. The conspiracy to rob and attempted robbery of Lenier Morales (Ramos's uncle) during the winter of 1997/1998 by Ramos and others

  3. Ramos's alledged contract to assault Benny Padilla, who is alleged to have attempted to murder enterprise members in retaliation for the robbery of Romero and Silva

  4. Weapons recovered in the spring of 1995 from Ramos' home, to wit: an Uzi, a shotgun, and two .38 caliber handguns

  5. Ramos's incarceration from 1995 to the present as the setting for a meeting with Danny Hernandez, the recovery of personal items (an address book and photographs), and the place of an alleged conversation between Ramos and Jose Diaz (Joe Monty) regarding the Benny Padilla matter.

  6. Three robberies, as detailed hereafter

 B. Other crimes that were the subject of the Government's motion were claimed to have been committed by individuals not on trial[15].  These include the following:

---

 [15]Roderick Soto's alleged attempted murder of someone known as "Archie" is included in the Government's motion, and is not a part of Ramos's motion in limine.  The July 8, 1997 robbery, murder (and dismemberment of the bodies) of John Vanages and Leonor Cruz-

1. The contract murder of Sandra and Maria Ceballos on October 21, 1990, two

   Columbian drug dealers by Danny Hernandez and others, allegedly on a

   contract from enterprise leader Charlie Villenueva

2. The May 23, 1991 murder of Pablo Vargas, a drug dealer, by Danny Hernandez

3. The October 18, 1991 attempted robbery, assault and murder of two drug

   dealers on Long Island

4. The March 24, 1998 robbery of Gilberto Estrada by Danny Hernandez and

   Jonathan Wagner

6. The March 1999 robbery of "Everlast" by Danny Hernandez, Richard Moreno,

   and others

## Applicable Law

"Evidence of other crimes ... is not admissible to prove the character of a person in order to show conformity therewith".   Rule 404(b) FRE.   The general rule is that the prosecution cannot introduce, on its direct case, evidence of other criminal acts of the defendant because of its inherently prejudicial effect.  Michelson v. United States, 335 U.S. 469 (1943).   Such evidence may be admissible for other purposes, such as, "motive, opportunity, intent preparation, plan, knowledge, identity, or absence of mistake or accident".  Rule 404(b) FRE.  However, evidence, even where relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence" Rule 403 FRE.  See United States v. Schiff, 612 F.2d 73 (2nd Cir. 1979); United

---

Simmons, a crime admitted in his guilty plea by Jose Pastrana, a Government witness.  The admission to this murder by a Government witness will be before the jury, and is not, therefore, a part of this motion.

States v. Robinson, 544 F.2d 611 (2nd Cir.), cert. den. 435 U.S. 905 (1976).

The task of the trial judge is to consider whether the proposed evidence has relevance to an issue at trial other than showing the criminal character of the defendant, and whether, if the evidence is relevant, its probative value is substantially outweighed by the danger of prejudice. United States v. Margiotta, 662 F.2d 131 (2nd Cir. 1981). See United States v. Manafzadeh, 592 F.2d 81 (2nd Cir. 1979)(other crimes not admissible regarding guilty knowledge and absence of mistake since they were not related to the crimes charged).  United States v. Inserra, 34 F.3d 83, 89 92nd Cir. 1994).  The settled standard for admitting such evidence requires the District Court to determine (1) whether there is a proper purpose for the evidence, (2) whether the evidence is relevant to a material issue in the case, and (3) wether the probative value of the proffered evidence is "substantially outweighed" by its prejudicial impact.  See United States v. Huddleston, 485 U.S. 681, 691-692 (1988);  United States v. Garcia, 291 F.3d 127 (2nd Cir. 2002)(proffered evidence of prior street cocaine sale by defendant not germane to whether he was knowledgeable in the  use of codes in drug trade).

## Discussion

In the case at bar, the defendant is charged with predicate acts dating to mid 1994 to early 1995, and is, notably, not identified by one of the leaders (Edwin DeLeon) of the "enterprise", and a rival gang member (Elvin sanchez) who was in a position to identify Woodbine Crew members, as even being a member before that time.  The crimes ante-dating his alleged "membership", and committed by others, worked an unfair prejudice on Ramos.  The subject criminal acts are particularly heinous, and inferentially demonstrate a criminal propensity on the part of the defendant, by an after-the-fact association.  The Government introduced evidence that Ramos, Danny Hernandez, and Jose Pastrana (Cholo) grew up in the same neighborhood, and

knew each other for years.  While this association, brought about by the circumstance of birth and parental residence, does not, without more, establish Ramos's connection to the "Woodbine Crew", the association with individuals who have committed the subject crimes unfairly prejudiced his claim that he was not.  This is especially so where those crimes precede his alleged membership by several years.

The recovery of certain weapons from the defendant's home in 1995, while occurring during the period of Ramos's alleged membership, nevertheless worked an additional prejudice on him.  Evidence of their recovery did not make the proof of the predicate acts more or less likely.  There was no proof that these caliber and type weapons were used in any the acts charged against Ramos or in any of the several criminal acts brought before the jury.   Ballistics evidence from the Munoz homicide indicates that a 9mm weapon was used, the autopsy report of the Valencia-Enciso homicide establishes that death was caused by manual strangulation, and the weapons alleged to he possessed in the Romero/Silva robbery are not identified.  Thus, there was no evidentiary connection between the weapons recovered from Ramos's home and the crimes charged.

Reference to the fact of Ramos's incarceration from the time of his arrest following seizure of the weapons from his home in 1995 to the present was clearly prejudicial.  That prejudice could easily have been dissipated by simply referencing that certain conversations (with Hernandez, Concepcion, and Diaz) occurred, without specifying a place, and (assuming otherwise its admissibility) that property (the photographs and address book) was simply recovered from the defendant.

The alleged plot to rob Lenier Morales was not, for all that appeared in the trial evidence, part of the racketeering conspiracy alleged, not did it have anything to do with the activities of

the Woodbine Crew, since the alleged motivation is nothing more than a lack of support for Ramos by his family while he was incarcerated.  The Government was required to demonstrate a connection between the racketeering enterprise as charged in the indictment, or that the proof of this crime is relevant to the charged predicate acts.  See United States v. Garcia, 291 F.3d, *supra* (lack of connection between the two offenses). The Government failed in that endeavor.

The Government also had to demonstrate that an attempt to assault Romero (the February 1995 robbery victim) by Ramos, individually, was motivated by the February 6, 1995 robbery, or Woodbine Crew activities (and not a separate, independent, criminal act).  Similarly, evidence must demonstrate that the assault on Benny Padilla, allegedly at the behest of Ramos, was motivated by Woodbine Crew interests.  For all that appeared at trial, there was only speculation and hearsay evidence that Padilla attempted to gain revenge on those who robbed Romero and Silva on February 6, 1995, and none that Ramos was aware of this.  Failing such evidence, the proffer was not relevant to the crimes charged and admissible as 404(b) evidence or as proof of the racketeering enterprise.  Id.

Jose Pastrana testified about three robberies allegedly perpetrated by Ramos, two with an individual named "Lazerus" and others (unidentified male blacks in one and unidentified females in the other).  All three offenses did not, for all that appears, meet the criterial for relevance to either the racketeering enterprise or as proof of the predicate acts. Id.

Pursuant to Rule 33 (A)(b)(2) a new trial should be ordered.

**Point 4. The Government failed to prove beyond a reasonable doubt that the defendant was a member or associated with the "Woodbine Crew" and the racketeering conviction must be voided and the indictment dismissed.**

The defendant was charged, in count one of the indictment, along with another[16], with conspiring to violate Section 1962 (c) of Title 18 of the United States Code.  That section provides:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in any activities of which effect interstate commerce to conduct or participate directly or indirectly in the conduct of such enterprise through a pattern of racketeering.

As the Court instructed[17], the government was obliged to establish four elements:

> (1) that the enterprise alleged in the indictment did exist
> (2) the enterprise affected interstate or foreign commerce
> (3) the defendant was associated with or employed by the enterprise
> (4) the defendant knowingly and intentionally agreed that he or other associates of the enterprise would commit a pattern of racketeering.

On this motion, the defendant eschews challenge to the first two elements, but respectfully contends that the government failed in its burden of proof with regard to the latter two.  The proof, as detailed in the Government's summation, of the existence of an enterprise that fits the statutory mandate, and of the membership of a plethora of individuals, including the co-defendant, Roderick Soto, is persuasive (T. 3121-3146).  The origin and early years of the group from the Woodbine area is described meticulously, and the evidence does demonstrate what the government wants it to.   In this barrage of proof (T.3121-3146), Ramos is not mentioned at all.  His introduction to the government's proof comes (on closing argument) with the evidence of the weapons seizure at his home on June 20, 1995, and is capped by the government's theory that, if you "need guns", you "go to Jay Rock" (T.3147).  This item of

---

[16]Roderick Soto

[17](See T.3506-3520)

"proof" of the defendant's inclusion is followed by immediate reference to the weapons seizures at the homes of gang members not on trial (and already convicted), and whose illicit status is, in fact, clearly shown by the record.[18]/[19] Thus, a seizure of illegal weapons that, by itself, has nothing to do with any predicate crimes, or anything to do with any other alleged gang member, becomes, by dint of immediate reference to similar episodes involving gang members, the linchpin of the government's case for the defendant's association.

The balance of the government's proof in this regard distills to nothing more than a theory of guilt by association.  Ramos is proven to have known Danny Hernandez and Jose Pastrana ("Cholo"), and is seen talking to them on the street and (also with Jonathan Wagner) at a public neighborhood event (T. 3164, 3165, 3166).   By stark contrast, the others (including Roderick Soto) are fixed immutably within the structure of the enterprise.  Significantly, Telly Concepcion, the steady driver for the organization, did not know Ramos, and Roderick Soto, his co-defendant at trial, was never connected to Ramos, in word or deed.  Jose Pastrana goes so far to say, in perhaps a rare moment of truth-telling, when naming the members of the organization, that they were all "considered ... a crew ... except for "Jay" (T.948).

The predicate crimes alleged by the government that purport to include Ramos in the "Woodbine Crew" do not link him with the others, but, giving the government the best reading of the evidence, rather suggest independent activity, having nothing to do with an organized, on-

---

[18]Weapons recovered from the home of Julio Monseratte included  9 mm, .25 caliber automatic, .44 magnum handguns and a 12 gauge shotgun.  Contraband seized from the homes of Danny Hernandez and Jonathan Wagner was then detailed (T.3148-3152).  Wagner was a charter member, and Hernandez easily the most notorious, whose macabre crimes were prominently displayed as part of the government's proof of the activities of the enterprise.

[19]It would, of course, be folly to challenge that kind of overwhelming proof, and as a tactic, involving those enterprise members not on trial, extremely damaging to the defense of the person being represented.

going, long-term conspiracy.[20]  The homicides of Valencia and Munoz, attributed by the government's proof to Ramos, can be seen as non organization matters.  Ramos was the principal player in the Valencia matter, according to Jose Pastrana, and, absent other evidence of Ramos's inclusion in the gang, is clearly an independent scheme (T.1066-1070).  The Munoz homicide was presented as the brain-child of Danny Hernandez, with Ramos just along for the ride, and its motive personal with Hernandez (T.1081).  Thus, two of the predicate crimes can be viewed as non-enterprise matters, and do not make the case for Ramos's membership or association.  The third predicate act, the robbery of Silva and Romero, identifies Ramos as no more than an add-on to that crime, someone who, giving the government the best view of the evidence, was not a prime player in that event.  Further, there is no evidence linking Ramos with the prolific narcotics activity of the "Woodbine Crew", and no direct evidence of an agreement to be one of them or to participate generally in their wide-spread activities.  There is only the testimony that he knew some of them and, as evidenced at trial, committed some criminal acts with some of them.  Similarly, the evidence of other crimes does little to establish the case for inclusion.  The plan to rob Ramos's uncle, again, giving the government the best view of the evidence, is clearly the result of a private pique, and not a "Woodbine Crew" undertaking.

In sum, the proof of guilt is built on "mere association", the prejudicial effect of the weapons seizure from Ramos's house (see Point One, *supra*), and the surmise that crimes committed independently, albeit with admitted gang members, and it is insufficient to establish the government's burden.

**Point Five.  Circumstantial evidence of the defendant's withdrawal from the conspiracy prior to 1998, bars prosecution for the racketeering and conspiracy charges in the**

---

[20]Indeed, the government concedes that Ramos's involvement was peripheral at best, terming him an "add-on", and a "late-comer", and someone who left "early" (T.3162)

**indictment.[21]**

As noted, the government, in closing argument, conceded that Ramos's involvement in the enterprise was limited, terming him an "add-on", a "late-comer", and one who "left early" (T.3162). The last concession is telling, and provides the linchpin for defendant's statute of limitations claim.

The government was required to prove "beyond a reasonable doubt that the respective conspiracies charged in [the indictment] continued at least until March 18, 1998 [the date the indictment was returned]" (T. 3520). The court continued "with respect to Count One, the government must prove that the charged conspiracy to conduct the affairs of the Woodbine crew continued at least until that date", and similarly with respect to count three, the conspiracy to commit robberies (T.3521). The government was, therefore, mandated to establish, beyond a reasonable doubt that "the purpose of the conspirac[ies being considered] were not accomplished or abandoned before March 19, 1998" (T. 3521)

It is respectfully submitted that the defendant, Luis Angel Ramos, effectively abandoned his role in the charged conspiracies. There is no evidence that narcotics activity (with the "crew") was part of Ramos's game plan. The predicate acts attributed to the defendant ended in early 1995 (the Silva/Romero robbery), and the uncharged crimes introduced as "404(b) evidence", even assuming their inclusion into enterprise activities, likewise ended prior to the effective date of the indictment. The robbery "conspiracy" that allegedly targeted Ramos's uncle is negligibly connected to gang activities, and there is no evidence that Ramos had any part in the Everlast scheme, the caper that provides the government's answer to the statute of limitations

---

[21]This argument assumes, but does not concede, that Ramos was a member or an associate in the "Woodbine Crew" (See Point Four, *supra*).

question.  By inference, then, Ramos's activities, if assumed to be a part of the enterprise, dwindle and then cease while he was in prison.  By that absence of criminal conduct associated, however remotely, with the enterprise, he has effectively abandoned his purported role.  He cannot, therefore, be logically, or by way of evidentiary proof, deemed to have continued in the charged conspiracies, and the indictment should be dismissed.

## <u>CONCLUSION</u>

The indictment should be dismissed, or, in the alternative, a new trial granted.

Respectfully submitted,

_____
Robert L. Moore (RLM0182)
Attorney for Defendant
Luis Angel Ramos

April 2005

cc:     Clerk of the Court (Electronic submission)

<u>Via U.S. Mail</u>

Hon. Edward R. Korman
United States District Judge
Eastern District of New York
Chambers
U.S. District Court
225 Cadman Plaza East
Brooklyn, New York 11201

Colleen Kavanaugh, Esq.
Assistant United States Attorney
Eastern District of New York
1 Pierrepont Plaza
Brooklyn, New York 11201

Luis Ramos
Reg #70000-053
MDC Brooklyn
80 29th Street
Brooklyn, NY 11232